IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRENDA DOLFI                                    :
          Plaintiff                :
                                   :
      v.                             :        3:CV-06-1262
                                   :        (JUDGE VANASKIE)
DISABILITY REINSURANCE           :
MANAGEMENT SERVICES, INC., UNITED       :
STATES LIFE INSURANCE COMPANY       :
          Defendants               :

<u>MEMORANDUM</u>

Nearly five and one-half years after she allegedly became disabled due to a work-related injury, Plaintiff Brenda Dolfi filed a claim for disability benefits with Defendant United States Life Insurance Company ("U.S. Life"),[1] the disability insurance carrier that issued a policy to her employer.  Despite the significant passage of time, Defendant Disability Reinsurance Management Services, Inc. ("DRMS"), the claims administrator, undertook a comprehensive investigation and review of Ms. Dolfi's claim.[2]  DRMS concluded that the evidence did not support Ms. Dolfi's claim that she was disabled by her physical injuries, but, however, it

_____

[1]U.S. Life notes that it was named incorrectly in the Complaint, and that its correct name is "The United States Life Insurance Company in the City of New York."  Because U.S. Life did not file a motion to amend the caption, the Court will refer to U.S. Life, when necessary, as it is identified in the Complaint.

[2]DRMS was subsequently dismissed from this lawsuit pursuant to a stipulation.  (Dkt. Entry 18.)

determined that the evidence established she was disabled due to a mental, nervous, or emotional disorder, and awarded benefits for a closed period.  Dissatisfied with this outcome, Ms. Dolfi commenced this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, to recover disability benefits.[3]  (Dkt. Entry 1.)[4]

Before the Court are Cross-Motions for Summary Judgment.  (Dkt. Entries 20 & 35.) Having carefully examined the administrative record of the benefits decision under the arbitrary and capricious standard, the Court concludes that the decision must be sustained.

I. BACKGROUND

A. The Plan and Claim Administration Process

Ms. Dolfi was employed by Luzerne County Community College ("LCCC"), the policyholder of a group insurance plan issued by U.S. Life that provided LCCC's full-time employees long-term disability benefits ("Plan").  (Admin. R. ("AR"), at 1-19 (Plan).)[5]  The Plan provides that if an employee, "while insured, . . . become[s] disabled and continue[s] to be so disabled past the waiting period, [U.S. Life] will pay to you [long-term disability] benefits."  (Id. at

---

[3]The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

[4]For the convenience of the reader of this opinion in electronic format, hyperlinks to the court record and pertinent authorities have been inserted.

[5]The parties submitted an administrative record comprised of over two thousand pages of Bate-stamped documents ("USLIFE #____") and divided among six separate docket entries. Because the record is disorganized – numbered almost entirely in descending order and docketed non-sequentially – citation will be to the Bates number on the Administrative Record.

10.)  Disability means total or partial disability.  (Id.) As defined by the Plan, "total disability"

means

> during the waiting period and thereafter, your complete inability to perform the
> material duties of your regular job.  "Your regular job" is that which you were
> performing on the day before total disability began.
>
> The total disability must be a result of an injury or sickness.  To be considered
> totally disabled, you must also be under the regular care of a physician.

(Id.)[6]

An employee totally disabled is entitled to benefits as determined by the Plan's Schedule

of Benefits.  Generally, an employee will receive a monthly benefit of seventy percent (70%) of

the employee's basic monthly pay, up to a monthly maximum of $5,000.  (Id. at 5.)  That benefit

is reduced, however, by the amount of income received from other sources, such as social

security disability benefits and workers' compensation benefits.  (Id. at 12.)  Benefits are paid

until the earlier of the date that the disability ends or the maximum benefit period ends.  (Id. at

11.)  The maximum benefit period varies depending on the employee's age at the onset of total

disability.  For employees disabled due to alcoholism, drug addiction, or mental, nervous, or

emotional disorder, the maximum benefit period is twenty-four months.  (Id. at 11.)

To file a claim for benefits, an employee must complete and submit a proof of claim

---

[6]The "waiting period" is the "period of consecutive days of disability for which no benefit
is payable."  (AR at 6.)  Under the Schedule of Benefits, the duration of the waiting period is
180 days, which begins on the first day of disability.  (Id. at 5-6.)

form.  (Id. at 18.)  Proof of claim forms may be available from the employer, but if not, the

employee must send written notice of the claim to U.S. Life within twenty days of the date of

loss.  (Id.)  Upon receipt of notice, U.S. Life will mail to the employee a proof of claim form.

(Id.)  The proof of claim form, whether obtained from the employer or U.S. Life, must be

completed by both the employer and employee, with additional proof attached if required, and

sent to U.S. Life within thirty days after the waiting period.  (Id.)  Late submission of a proof of

claim will not result in denial or reduction of benefits "if . . . proof was sent as soon as possible."

(Id.)  The employee is subject to examination, at U.S. Life's expense, as often as necessary to

process a claim.  (Id.)  Moreover, "[U.S. Life ] may require more proof as often as needed to

verify disability."  (Id.)

Although a reading of the Plan suggests U.S. Life is the administrator, (see id.), the Plan

is actually administered by DRMS pursuant to an "Agreement for Group Long Term Disability

Claims Adjudication effective August 1, 2000."  (Knutsen Decl., Dkt. Entry 25, ¶ 2.)  DRMS

administered Ms. Dolfi's claim.  (Id. ¶ 3.)

DRMS handles all aspects of the claim administration process, from initial review to final

administrative appeal.  Following the initial review, DRMS sends a letter to the employee

advising her of the benefits decision and, if the claim is denied, stating the specific reasons for

the denial.  (AR at 173.)  An employee denied benefits has 180 days from receipt of the

adverse decision to file an appeal.  (Id.)  On appeal, DRMS reconsiders and reevaluates the

employee's entire claim file and will also consider any new information submitted by the employee.  (Id. at 1393.)  "The appeal review will not be conducted by an individual who made the original adverse determination; nor will they be a subordinate of that decision-maker."  (Id. at 1392.)  The employee will receive from DRMS another decision letter stating the specific reasons for DRMS's determination.  (Id.)  If the appeal results in a decision adverse to the employee, the employee has the option of requesting a second appeal review or filing a lawsuit under ERISA to recover benefits.  Electing the former requires the employee to file an appeal within 60 days of receipt of the adverse decision.  (Id.)  Like the first appeal, this review involves a complete reconsideration and reevaluation of the claim file (along with any new information submitted by the employee) and is not "conducted by an individual who made the original adverse determination or conducted the first appeal review; nor will they be a subordinate of either of the prior decision-makers."  (Id. at 1392, 1974.)  Should the employee disagree with the determination made following the second appeal, the employee's recourse is an ERISA lawsuit.  (Id. at 2041.)

If, on the other hand, DRMS determines on initial or appellate review that an employee is disabled and entitled to benefits under the plan, DRMS itself issues the employee a benefit check.  (See id. at 1975 ("Under separate cover we will issue a benefit check . . . .").)  There is nothing in the record indicating that decisions favorable to an employee must be approved by U.S. Life prior to the issuance of a benefit check.

B. Ms. Dolfi's Employment with LCCC

Ms. Dolfi worked as a job placement coordinator with LCCC from January 5, 1998, to May 24, 1999.  (Id. at 145.)  Working full-time, she was an insured employee under the Plan.  (See id. at 7.)  Among other duties, she was responsible for devising and implementing gender equity programs, providing "nontraditional career awareness and vocational assessment," facilitating student support activities, and teaching students "employability and coping skills."  (Id. at 170.)  The position was not physically demanding.  In this regard, an eight-hour workday entailed two to four hours of standing, zero to two hours of walking, and four to six hours of sitting.  (Id. at 171.)  Occasionally she was required to lift or carry zero to ten pounds.  (Id.)  She was not required, however, to use her hands for grasping, pushing or pulling, or "fine manipulation," nor was she expected to bend, squat, climb, crawl, twist/turn, or reach above her shoulder.  (Id.)

C. Ms. Dolfi's Work Injury and Medical Treatment

On April 26, 1999, Ms. Dolfi was injured at work when she attempted to prevent a filing cabinet from falling onto a nearby secretary.  Observing the toppling cabinet, she rushed over and thrust her shoulder against the cabinet, wrapped her arms around the secretary, and, in a twisting motion, pulled her from the cabinet, which crashed to the floor.  (Id. at 600-599.)  Ms. Dolfi felt two cracks in her back as she pivoted away from the cabinet.  (Id. at 599.)  Immediately she experienced pain along the right side of her body, particularly in her back,

shoulder, and neck.  (Id.)  She also had a headache and later felt nauseous.  (Id.)[7]

After being evaluated by an LCCC nurse, Ms. Dolfi sought treatment at the Wilkes Barre General Hospital.  She related the incident at work, noting a burning sensation in her low back after she pivoted away from the cabinet, and complained of a headache, right neck pain, right shoulder pain, and low back pain that ran through her buttocks into her right thigh.  (Id. at 1615.)  A physical examination revealed tenderness primarily in the right shoulder and cervical, thoracic, and lumbar spines, with limited range of motion in those regions.  (Id. at 1612.)  X-rays were taken of the right shoulder and cervical and lumbar spines; other than slight straightening of the cervical spine possibly due to muscle spasm, X-rays were negative for abnormalities.  (Id. at 1610-1608.)  Diagnosed with cervical strain, lumbar strain, and right shoulder pain, Ms. Dolfi was directed to take Norflex and Motrin, and released.  (Id. at 1615, 1611.)

Several days later Ms. Dolfi returned to work.  She experienced increased pain in her neck, right shoulder, and back, with pain radiating down her right leg, and more intense

---

[7]Her co-workers, however, contradicted her version of the incident.  LCCC staff were interviewed by Dwyer Adjustment Company in connection with Ms. Dolfi's workers' compensation claim.  Patricia Minsavage, the secretary purportedly rescued by Ms. Dolfi, stated Ms. Dolfi was not struck by the cabinet.  (Id. at 604.)  Nor did Ms. Dolfi ever tell Ms. Minsavage that she was struck by the cabinet.  (Id.)  Kim Knight corroborated Ms. Minsavage's statement that the filing cabinet never struck Ms. Dolfi.  (Id.)  Barb Price, LCCC's Director of Career Planning and Job Placement, stated Ms. Dolfi complained the morning of the incident of back pain due to her grandson jumping on her back.  (Id.)  Finally, Ester Liuzzi, R.N., the LCCC nurse who examined Ms. Dolfi after the alleged incident, said Ms. Dolfi reported minimal back pain, but made no mention of a headache.  (Id.)  Nurse Liuzzi could not recall Ms. Dolfi indicating there was contact between her and the cabinet.  (Id.)

headaches.  Ms. Dolfi was referred to Peter Feinstein, M.D., whom she first saw May 7, 1999.

Dr. Feinstein examined Ms. Dolfi and noted bilateral tenderness in the "paracervical

musculature," greater on the right side; slightly positive straight leg raising in the right leg,

although no "motor deficits"; and "slight diminution of sensation in the right lateral calf," but

otherwise normal sensation.  (Id. at 1622.)  Dr. Feinstein diagnosed "[m]yofascial or whiplash

injury to the cervical spine and lumbar spine with possible discogenic irritation in the cervical

and lumbar spine.  Bruise of the left shoulder, resolved."  (Id. at 1623.)[8]  He prescribed Dolobid,

an anti-inflammatory medication, Flexeril, a muscle relaxant, and physical therapy.  (Id. at

1622.)  Her prognosis was fair, and she was permitted to return to her pre-injury job without

restriction.  (Id.)

Ms. Dolfi was next seen by Dr. Feinstein on May 17, 1999, presenting similar complaints

of pain and difficulty sleeping.  (Id. at 1625.)  She had negative straight leg raising and walked

without limping.  (Id. at 1624.)  Dr. Feinstein advised Ms. Dolfi to see a neurosurgeon to

evaluate her headaches.  (Id. at 1625.)  He also prescribed Darvocet and advised her not to

return to work, though he recommended that she continue her normal routine and walk for

exercise.  (Id. at 1625-1624.)

On May 20, 1999, MRIs were obtained of Ms. Dolfi's cervical and lumbar spines.  Other

---

[8]There are discrepancies in the record as to whether Ms. Dolfi injured her right or left
shoulder.  The discrepancies are immaterial to the motions.

than a "[h]emangioma of bone in the T2 vertebral body," the MRI of the cervical spine was "unremarkable," and there was no evidence of disc herniation or spinal stenosis.[9]  (Id. at 1652.) The MRI of the lumbar spine demonstrated "[m]ild disc degeneration at L3-4 associated with posterior disc bulge [lateralizing] slightly to the right of midline," but there was no evidence of disc herniation or spinal stenosis.  (Id. at 1651.)  At L4-5, the MRI depicted mild disc degeneration with abnormal soft tissue along right posterolateral aspect of L4-5, suggesting possible disc herniation.  (Id. at 1651-1650.)  Significantly, there was no evidence of spinal stenosis or of "mass effect on the exiting nerve root."  (Id.)

Dr. Feinstein noted the MRI results at Ms. Dolfi's next appointment, June 1, 1999.  (Id. at 1626.)  Along with her usual complaints, Ms. Dolfi presented swelling and pain in her left knee and ankle.  (Id. at 1627.)  A physical examination, however, was negative for pain and other abnormalities.  (Id. at 1626.)  Dr. Feinstein recommended physical therapy, suggested epidural injections may be necessary, and provided a note to remain out of work.  (Id. at 1627-1626.)

On June 3, 1999, Ms. Dolfi was evaluated by A.R. Samii, M.D., a board-certified psychiatrist and neurologist.  On examination, he observed questionable decreased senses in

---

[9]"Spinal stenosis" is "a narrowing of one or more areas in [the] spine . . . .  This narrowing can put pressure on [the] spinal cord or on the nerves that branch out from the compressed areas.  Spinal stenosis can cause . . . pain or numbness in [the] legs [or] a loss of sensation in [the] extremities."  Mayo Clinic, Spinal Stenosis (2008), http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited Aug. 21, 2008).

the right foot and hand and tenderness in the right side of neck and paracervical area, but

otherwise the examination was unremarkable.  (Id. at 1512-1511.)  Dr. Samii reviewed the

recent MRIs of the cervical and lumbar spines, noting there was no evidence of compression of

the root area at the lumbar spine.  (Id. at 1511.)  He diagnosed Ms. Dolfi as having sustained a

cervical sprain, which contributed to her daily headaches, and a low back sprain.

Acknowledging Ms. Dolfi's complaint of radicular pain to the right leg, he thought this was

possibly related to "L4-L5 root compression.  However, this was not seen in MRI reports."  (Id.)

To investigate further, Dr. Samii ordered an electromyogram, or "EMG," of Ms. Dolfi's right

extremities.  (Id.; see id. at 1510-1503.)  After reviewing the results, Dr. Samii concluded there

was "[m]ild degree right carpel tunnel syndrome [but] no electrophysiological evidence of

radiculopathy."[10]  (Id. at 1510.)

---

[10]According to the University of California Davis Spine Center,

[r]adiculopathy is the irritation of the nerve caused by a narrowing in the
spinal canals.  This can be due to a herniated disc, spinal stenosis, a tumor,
an infection or any other cause of nerve compression. . . .

. . . Cervical radiculopathy can lead to painful burning or tingling
sensations in the arms.  Lumbar radiculopathy can cause shooting pain in the
legs sometimes called sciatica.  Numbness and tingling or weakness of the
arms or the legs can also result from nerve irritation in the lower back. . . .

Radiculopathy is suspected when the patient experiences
characteristic pain and displays typical signs or symptoms.  Spine center
physicians use physical examination, imaging (X-ray, MRI or CAT scan) and

(continued...)

Ms. Dolfi saw Dr. Feinstein again on June 15 and July 1, 1999.  At the June

appointment, she was "visibly teary and upset" and was contemplating consulting a counselor

for her emotional problems.  (Id. at 1629.)  Dr. Feinstein encouraged her to contact a

psychologist because of her anxiety and depression.  (Id. at 322, 1628.)  On July 1, Dr.

Feinstein reviewed a job description forwarded to him and concluded Ms. Dolfi was unable to

perform that job, or any other work activity, at the present time.[11]  (Id. at 1631.)  He altered Ms.

Dolfi's prognosis from "fair" to "guarded," (id. at 1630), reasoning that Ms. Dolfi "continued to

remain symptomatic in a significant way, despite having tried the really extensive variety of

therapeutic interventions that weren't helping her."  (Id. at 319.)

July 1 was also Ms. Dolfi's first counseling session at the Psych Center of Northeast

Pennsylvania.  She treated there until April 20, 2000, primarily with Michael A. Youron, M.A., a

---

[10](...continued)
nerve studies to help confirm the condition and recommend treatment.

UC Davis Spine Center, Pinched nerve, radiculopathy,
http://www.ucdmc.ucdavis.edu/spine/specialties/pinched_nerve.html (last visited Aug. 21,
2008).

[11]Dr. Feinstein addressed a letter, dated August 2, 1999, to Andree Timmons of Guard
Co., Inc. ("Guard"), LCCC's workers' compensation insurance carrier.  Mr. Timmons provided
Dr. Feinstein a description of a job to accommodate Ms. Dolfi's condition, which Dr. Feinstein
characterized as "essentially Ms. Dolfi's normal job description."  (AR at 1901.)  Dr. Feinstein
disapproved this position, explaining Ms. Dolfi "is unable to do that job because currently she is
on a significant amount of medication which affects both her ability to concentrate and requires
treatment for her headaches, as well as for pain."  (Id.)  Once her medication is reduced, Dr.
Feinstein indicated he would reconsider his disapproval of the proposed job.  (Id.)

licensed psychologist, and at times with Drs. Cupple and Sanjay S. Chandragiri, staff psychiatrists.  (See id. at 1521-1533.)  Mr. Youron's observations and conclusions are best summarized in an August 20, 1999, letter to Guard's Rocko Pierantoni  (See id. at 454-453.) Following the accident at work, Ms. Dolfi reported feeling depressed and anxious, having trouble sleeping, and suffering panic attacks.  (Id. at 454.)  She also presented agoraphobia-like symptoms.  (Id.)[12]  The accident impeded her ability to cope with stress and resurrected traumatic events previously experienced in her life.  (Id.)  For instance, her stepson recently committed suicide.  (Id.)  And, though not referred to in the letter, Ms. Dolfi confided to Mr. Youron that she was abused sexually as a child.  (Id. at 1523.)  Mr. Youron concluded Ms. Dolfi was suffering from Post-Traumatic Stress Disorder ("PTSD"), the traumatic event being the injury at work.  (Id. at 454.)  Her perceived vulnerability after the accident triggered depression, a sense of hopelessness, nightmares, and diminished interest in socialization.  (Id.)  Further aggravating her condition was the revival of previous trauma experienced in her life.  (Id. at 453.)  Mr. Youron wrote that Buspar might be an appropriate psychopharmacological treatment to alleviate Ms. Dolfi's symptoms.  (Id.)  He was optimistic that psychotherapy would enable Ms. Dolfi to regain her self-worth and alleviate her symptoms.  (Id.)  Treatment continued thereafter

---

[12]"Agoraphobia" is the abnormal fear of being in a public place from which there is perceived to be no immediate escape.  (AR at 249.)  A person exhibiting symptoms of agoraphobia will suffer panic attacks characterized by rapid heart beat, tremors, sweating, dizziness, and intense fear.  (Id.)

with Mr. Youron, and his office notes indicate Ms. Dolfi's condition varied little from this assessment.  (See id. at 1521-1533.)

On July 16, 1999, Ms. Dolfi was examined by a second neurologist, V.D. Dhaduk, M.D. Along with her usual symptoms, she complained of pain radiating into both upper extremities. (Id. at 1515.)  Dr. Dhaduk examined Ms. Dolfi and reviewed the MRIs of her brain and cervical and lumbar spines.  (Id. at 1514-1513.)  He diagnosed Ms. Dolfi's work-related injury as "severe post-traumatic tension vascular headache," "cervical radiculopathy with paraspinal muscle spasm," and "degenerative and herniated disc with lumbar radiculopathy mainly at L5-S1 level." (Id. at 1513.)  Several treatment options were recommended regarding medication, exercise, and diet.  (Id.)

Ms. Dolfi was seen again by Dr. Feinstein on July 22, August 23, and September 21, 1999.  Her complaints and physical examination were essentially unchanged, although Dr. Feinstein observed positive right straight leg raising at the August and September visits.  (Id. at 1636, 1640.)  He also noted during the August visit that Ms. Dolfi exhibited anxiety symptomotology.[13]  (Id. at 1636.)  Ms. Dolfi was encouraged to walk and be active physically as much as possible and to continue treatment with the other providers.  (Id. at 1633, 1636, 1641.)

On August 17, 1999, Ms. Dolfi had her first appointment with pain management

---

[13]In this regard, Dr. Feinstein explained that Ms. Dolfi "was very concerned to a pathologic level regarding her future, her status, and this was distracting her from normal activities of living."  (AR at 317.)

specialist Asit P. Patel, M.D.  Upon examination, Dr. Patel found tenderness and positive straight leg raising.  He and reviewed her lumbar MRI, which he noted revealed "mild disc degeneration at L3-4 with posterior disc bulge lateralizing slightly to the right." (Id. at 1536-1535.)  Assessing her back and right leg pain as "probable neuropathic pain" and her neck pain as "mostly musculoskeletal in nature with component of occipital neuralgia," Dr. Patel administered a lumbar epidural steroid injection and recommended future trigger point injections in cervical paravertebral region and occipital nerve block. (Id. at 1535.)

A third neurologist, Dorothy A. Farrell, M.D., evaluated Ms. Dolfi on September 8, 1999. Ms. Dolfi complained of persistent neck pain, low back pain radiating down her right leg, and daily headaches, and reported difficulty sleeping, anxiety, nightmares, and personality change. (Id. at 1552-1551.)  Dr. Farrell examined Ms. Dolfi and reviewed several diagnostic studies. (Id. at 1550.)  Concluding Ms. Dolfi presented a "mixed picture," Dr. Farrell diagnosed her condition as cervical strain, myofascial pain, headaches ("mixed with muscle contraction and migraines"), and lumbar disc. (Id.)  She prescribed medications to alleviate the pain and the migraine headaches. (Id.)  Additionally, Dr. Farrell recommended Ms. Dolfi continue the steroid injection therapy from Dr. Patel and the "ongoing psychiatric care for anxiety and depression which is significant in her symptoms." (Id.)

A second MRI of Ms. Dolfi's lumbar spine was obtained September 21, 1999.  The image was essentially unchanged from the May 20 MRI. (Id. at 1676.)  At L3-4, there was mild

diffuse disc bulge, but "no evidence of compromise of the spinal canal or exiting nerve roots."

(Id. at 1677; see also id. at 1676 (noting disc bulge "does not contribute to compromise of the

spinal canal or exiting nerve roots").)  No additional herniations or bulges were observed.  (Id.

at 1676.)  At both L4-5 and L5-S1, there was no evidence of disc protrusion or extrusion or of

"compromise of the spinal canal or exiting nerve roots."  (Id. at 1677-1676.)  The report

concluded that "[Ms. Dolfi's] given history of lower extremity radiculopathy are not explained on

this MRI."  (Id. at 1676.)

Ms. Dolfi returned to Dr. Patel on September 30, 1999.  Dr. Patel reviewed the recent

MRI of the lumbar spine and remarked that it was unchanged from the previous MRI.  (Id. at

1538.)  He now attributed her back and right leg pain to "[p]ossible SI arthropathy" and ruled

out, inter alia, lumbar radiculopathy.  (Id.)  A right S1 joint injection and trigger point injection

were administered along the cervical and thoracic muscles.  (Id. at 1537.)  These injections

provided pain relief, Ms. Dolfi reported at her next visit on November 8, 1999, especially the

trigger point injections that alleviated significantly her neck and upper back pain and

headaches.  (Id. at 1540.)  Dr. Patel administered lumbar facet injections at bilateral L4-5 and

L5-S1.  (Id. at 1539.)  He also modified his impression of Ms. Dolfi's back and right leg pain,

this time characterizing it as musculoskeletal pain.  (Id. at 1540.)

Following a visit with Dr. Farrell on October 12, 1999, (id. at 1554-1553), Ms. Dolfi saw

Dr. Feinstein again on November 1, 1999, and December 13, 1999.  Her complaints of pain

varied little from previous examinations.  (Id. at 1671, 781.)  Dr. Feinstein agreed that the MRI of the lumbar spine obtained in September was unchanged from the MRI obtained in May.  (Id. at 1670.)  The December office note indicates that some time prior to the visit Ms. Dolfi returned to work for four hours, but her migraine headaches and other symptoms prevented her from working additional days.  (Id. at 781.)  Her prognosis remained guarded, and she was to remain off work.  (Id. at 1670, 781.)

Eric H. Wolfson, M.D., another neurologist, examined Ms. Dolfi on December 9, 1999.  He also reviewed the September 21 MRI of the lumbar spine and the May 20 MRI of the cervical spine.  (Id. at 1517-1516.)  Dr. Wolfson diagnosed Ms. Dolfi's condition as "Right Lumbar Radiculopathy, Herniated Lumbar Disc L3/4," and "Cervical Radiculopathy."  (Id. at 1516.)  He recommended another MRI of the cervical spine and further lumbar epidural blocks to manage the lumbar radiculopathy.  (Id.)  An MRI of Ms. Dolfi's cervical spine was obtained December 14, 1999, which showed a normal cervical spine with no "focal herniation, spinal stenosis or foraminal encroachment."  (Id. at 472.)  Ms. Dolfi followed-up with Dr. Wolfson on February 8, 2000.  (Id. at 795.)  After reviewing the recent cervical MRI, Dr. Wolfson opined that her condition was "Intractable Neck Pain, Headache, and Low Back Pain."  (Id.)  He recommended continued conservative pain treatment.  (Id.)

Dr. Patel treated Ms. Dolfi again on January 20, 2000, and February 7, 2000.  Regarding Ms. Dolfi's back and right leg pain, Dr. Patel ruled out lumbar radiculopathy and

16

musculoskeletal pain.  (Id. at 1542, 1544.)  He encouraged Ms. Dolfi to continue psychological therapy.  (Id. at 1541, 1543.)  During the February appointment, Dr. Patel administered lumbar epidural steroid injections at L3-4, trigger point injections along the right side cervical paravertebral muscles, and right occipital nerve blocks.  (Id. at 1543.)

In January, 2000, Dr. Feinstein received from Keystone Rehabilitation, Inc. ("Keystone") – an entity assisting LCCC's workers' compensation insurance carrier – pre-injury and modified job descriptions of Ms. Dolfi's position as job placement coordinator.  (Id. at 1643.)  Dr. Feinstein opined that Ms. Dolfi could perform either job, provided she could begin working one hour per day the first week, adding an additional hour per day each week as she could tolerate.  (Id.)  His approval was further conditioned on LCCC permitting Ms. Dolfi to "go to the nurse's office for a break and rest and recline as needed."  (Id.)

Keystone's Jody Lapinski replied to Dr. Feinstein in a letter dated February 10, 2000, which enclosed for his approval the pre-injury and modified job descriptions.  (Id. at 274-273; see also id. at 1885-1880.)  Both descriptions involved the same duties and responsibilities, (compare id. at 1885-1884 (pre-injury), with id. at 1882-1881 (modified)), and varied only as to physical requirements.  (Compare id. at 1883 (pre-injury), with id. at 1880 (modified).)  The description of the modified position addressed Dr. Feinstein's concerns.  For example, Ms. Dolfi would be allowed to rest and recline as needed in the nurse's office.  (Id. at 1880.)  Dr. Feinstein approved both descriptions on February 14, 2000.  (Id. at 273, 1883, 1880.)

17

Additionally, Dr. Feinstein completed a "Physical Capabilities Checklist" in which he indicated that, in an eight-hour day, Ms. Dolfi could stand one to three hours, sit three to five hours, walk one to three hours, drive one to three hours, and could lift no more than ten pounds.  (Id. at 1644.)

After seeing Dr. Farrell on February 10 and 23, 2000, where she discussed the injection therapy and indicated she was still experiencing anxiety and panic attacks and compulsive behavior, (id. at 1558-1555), Ms. Dolfi was evaluated by Dr. Chandragiri on February 24, 2000. (Id. at 250-249.)  He diagnosed her with PTSD, panic disorder with agoraphobia, and depression.  (Id. at 248, 233.)  He increased her prescribed dosage of Paxil and also prescribed Ativan.  (Id. at 248.)  Ms. Dolfi was advised not to return to work for two weeks because "her current emotional state would impair job performance."  (Id. at 1208.)

By March, Dr. Feinstein reversed his opinion regarding Ms. Dolfi's ability to perform either the pre-injury or modified positions and concluded she could work neither.  During her March 13, 2000, appointment, he provided her with a note stating "patient out of work indefinitely."  (Id. at 1618.)  Other than the recent incident where her right leg gave out, resulting in an emergency room visit, Ms. Dolfi's condition appeared to be unchanged.  (Id. at 493.)  According to his office note, Dr. Feinstein advised Ms. Dolfi that there was nothing more he could do for her orthopedically and that "she should be on total disability at the current time." (Id.)  At his deposition in the related workers' compensation proceeding, Dr. Feinstein testified

18

that the reason he concluded Ms. Dolfi could work neither position was due primarily to the fact "she was on so much medication for her complaints that even if physically she was capable of performing those jobs . . . that with the medication . . . she would be incapable of performing those jobs." (Id. at 305; see also id. at 265-264 (discussing side effects).)  He was also influenced by Dr. Chandragiri's February 24, 2000, letter where he wrote that Ms. Dolfi was unable to work for two weeks.  (Id. at 266.)  Regarding his justification based on the impairment from the medication, Dr. Feinstein conceded he did not propose changing Ms. Dolfi's medications when he approved the job descriptions in February.  (Id. at 264-263.)  He also identified no particular job duties that Ms. Dolfi's condition would prevent her from performing. (Id. at 263.)

In an April 11, 2000, letter to Keystone's Ms. Lapinski, Dr. Feinstein reiterated his opinion that Ms. Dolfi is "unable to work for an indefinite period of time."  (Id. at 1836.)  A physician's note certifying that Ms. Dolfi was to be out of work indefinitely was issued the following day.  (Id. at 1617.)

Dr. Feinstein last saw Ms. Dolfi on June 26, 2000.  Dr. Feinstein advised her that her condition was neurologic, not orthopedic, and that she should consult her neurologist.  (Id. at 1834.)  He also provided a note certifying that she was to be "out of work indefinitely."  (Id. at 1684.)

Ms. Dolfi continued to treat with other doctors.  She visited Dr. Patel on March 9, May

11, and August 7, 2000.  Dr. Patel altered his assessment of Ms. Dolfi's back and right leg pain,

now suspecting lumbar radiculopathy and ruling out musculoskeletal pain and arthropathy.  (Id.

at 928, 931, 912.)  The final appointment occurred on January 8, 2001.  (Id. at 986-989.)

Injections continued to provide her with temporary pain relief.  (Id. at 987, 989.)  Dr. Patel

modified his assessment of Ms. Dolfi's back and right leg pain, suspecting "lumbar facet

arthropathy."  (Id. at 987-988.)

Additional appointments with Dr. Chandragiri occurred March 16, and April 20, 2000.

(Counseling sessions continued sporadically with Mr. Youron until April 26, 2000.  (See id. at

234).)  Ms. Dolfi's panic level improved somewhat, but she remained extremely anxious and

tended to isolate herself.  (Id. at 238-236.)  At his deposition in connection with the workers'

compensation proceeding, Dr. Chandragiri opined – as of May 1, 2000 – that Ms. Dolfi was

unable to perform her pre-injury or modified position because her emotional condition, along

with the side effects of her medication, would impair her ability to counsel students, an

important part of her position as job placement coordinator.  (Id. at 231-230.)[14]

Ms. Dolfi saw neither Dr. Chandragiri nor Mr. Youron after April 26, 2000.  In fact, she

received no further treatment from mental health providers until February 24, 2004, when she

_____

[14]Side effects of Ativan are decreased ability to concentrate and diminished cognitive
functions; with Paxil, upset stomach.  (AR at 247.)  Ms. Dolfi reported no side effects from
either medication.  (Id. at 235.)

visited psychiatrist Matthew Berger, M.D.  (See id. at 1820-1819.)[15]

Finally, Ms. Dolfi continued to treat with Dr. Farrell through at least May 17, 2005.  The

administrative record contains Dr. Farrell's office notes, most of which are cryptic and wholly or

partly illegible.  It appears, however, that Ms. Dolfi's condition was relatively unchanged.[16]  She

consistently complained of neck pain, low back pain, and right leg pain, and occasionally groin

pain and back spasms and, at times, reported numbness, tingling, or burning sensation.  An

October 24, 2002, MRI of the lumbar spine revealed disc degeneration and protrusion at L3-4

with bilateral nerve root compression, as well as "moderate compression of the nerve roots . . .

at L3-4 on the left side in the inferior aspect of the foramen."  (Id. at 1501.)[17]  Dr. Farrell treated

---

[15]Dr. Chandragiri testified at his deposition that Ms. Dolfi's next scheduled appointment was May 11, 2000.  (AR at 234.)  The administrative record, however, contains no evidence of office visits after April, 2000.  Moreover, Ms. Dolfi does not allege that the administrative record is incomplete or that these appointments in fact occurred.

[16]Additional visits occurred April 13, 2000, (AR at 1560); June 8, 2000, (id. at 1561); August 7, 2000, (id. at 1562); November 13, 2000, (id. at 1564); January 8, 2001, (id. at 1566); February 22, 2001, (id. at 1568); April 23, 2001, (id. at 1570); June 20, 2001, (id. at 1572); January 11, 2002, (id. at 1574); April 28, 2002, (id. at 1578); September 30, 2002, (id. at 1580); October 29, 2002, (id. at 1582); February 18, 2003, (id. at 1585); April 3, 2003, (id. at 1587); August 19, 2003, (id. at 1576); September 18, 2003, (id. at 1589); November 15, 2003, (id. at 1592); March 2, 2004, (id. at 1594); May 27, 2004, (id. at 1094); November 16, 2004, (id. at 1096); and May 17, 2005.  (Id. at 1997.)

[17]Dr. Farrell also ordered MRIs of the thoracic and cervical spines, which were obtained, respectively, December 4, 2000, and April 30, 2001.  Except for a hemangioma at the T12 vertebral body level, the MRI of the thoracic spine was unremarkable.  (AR at 985-984.)  The MRI of the cervical spine displayed "broad base anterior extradural compression . . . over the thecal sac from C3 to C7 due to bulging discs," but there was no evidence of disc herniation or
(continued...)

Ms. Dolfi's pain primarily with palliative measures.  Ms. Dolfi also complained regularly of

anxiety, panic attacks, and depression, for which she was prescribed anti-depressants.  Finally,

Dr. Farrell's office notes reflect ongoing complaints of headaches, but in this regard, there was

observed improvement.  (See, e.g., id. at 1561-1562, 1572, 1585.)

Prior to January 27, 2003, Dr. Farrell offered no opinion regarding Ms. Dolfi's ability to

return to work.  On that date, however, she wrote a letter, addressed "To Whom It May

Concern," advising the addressee that Ms. Dolfi was her patient; that she was "being treated for

lumbar/cervical strain, myofascial pain, post traumatic migraine, post traumatic stress, [and]

lumbar disc syndrome"; and that she was "unable to work at this time."  (Id. at 1583.)  What

prompted this note is unknown, and Dr. Farrell did not elaborate why Ms. Dolfi was disabled

from work.[18]

---

[17](...continued)
spinal stenosis.  (Id. at 541.)

[18]Two other doctors evaluated Ms. Dolfi.  Ernest Gelb, D.O., saw her on five occasions:
September 2, 1999; March 9, 2000; January 11, 2001; July 13, 2004; and November 18, 2004.
(Id. at 1349-1344.)  Her complaints of physical and psychological symptoms, as well Dr. Gelb's
assessment of her condition, were consistent with what she reported to and heard from other
doctors.  (See generally id.)  Following the July 13, 2004, appointment, he referred her for MRIs
of the lumbar and thoracic spines.  (Id. at 1345.)  Other than some benign hemangiomas, the
thoracic spine was unremarkable.  (Id. at 1343.)  The lumbar spine was shown with "[m]oderate
degeneration of the disk at L3-4 with disk space narrowing and irregularity of the end plates.
There [was] broad based osteodiscophytic protrusion resulting in mild foraminal narrowing . . .
more pronounced on the left."  (Id. at 1342.)  Other discs appeared normal, except for mild
desiccation, as did the spinal canal and remaining foramina.  (Id.)  Whether Dr. Gelb reviewed
these results with Ms. Dolfi is unknown, but his office note from November 18, 2004, indicates
(continued...)

D. <u>Workers' Compensation Proceedings</u>

Prior to filing her claim for disability benefits, Ms. Dolfi sought workers' compensation benefits.  In that regard, Ms. Dolfi submitted to three independent medical examinations arranged by LCCC's workers' compensation insurance carrier.  John A. Kline Jr., M.D., performed two physiatric independent medical evaluations.  The first was October 19, 1999.  (See id. at 1898-1890.)  Dr. Kline obtained a history from Ms. Dolfi and reviewed emergency room records, other physicians' office notes, and X-ray and MRI reports.  (Id. at 1898-1894.)  A physical examination revealed some tenderness and reduced range of motion, but otherwise findings were negative or normal.  (Id. at 1894-1893.)  An overall positive Waddell's Test suggested Ms. Dolfi "exhibit[ed] over-reaction" to certain tests.  (Id. at 1893.)  Dr. Kline prepared an illness behavior profile of Ms. Dolfi based on her responses or reactions to three separate tests: (1) a pain/behavior questionnaire – results consistent with high symptom exaggeration; (2) validity testing – overall interpreted as invalid, with the patient exhibiting a

---

[18](...continued)
that Ms. Dolfi at the time was "[d]oing reasonably well" and preparing for a trip.  (Id. at 1344.)

Dong-Joon Oh, M.D., evaluated Ms. Dolfi on August 5, 2004.  (Id. at 1136.)  On examination, he found tenderness along Ms. Dolfi's right paralumbar vertebral area and her right sacroiliac joint.  (Id.)  Given these findings and Ms. Dolfi's complaints, Dr. Oh seemed surprised by the recent lumbar MRI that showed "mild foraminal narrowing . . . more pronounced on the left.  Actually," he observed, "the patient has more pain on the right."  (Id.)  Dr. Oh assessed her condition as "[l]umbar radiculopathy with degenerative disc disease with lumbar facet joint arthropathy and right sacroiliac joint arthropathy."  (Id.)

poor effort; and (3) myotest summary – left side rated valid, right side invalid due to patient's poor effort.  (Id. at 1892.)  These findings, combined with the positive Waddell's Test, "indicate[d] a high degree of inappropriate pain behavior for the anatomic injury incurred."  (Id.) Dr. Kline diagnosed Ms. Dolfi's work-related injury as "L3-4 posterior disc bulge, lateralizing slightly to the right," and "[r]esolved cervical strain," but opined that her depression, symptom magnification, headaches, and nerve entrapment at carpal tunnel were unrelated to the injury. (Id.)  In his view, Ms. Dolfi was able to work full time at a light to light-medium capacity with no restriction on driving (other than changing position), simple grasping, fine manipulation, or pushing and pulling with either arm.  (Id. at 1891.)  She was to avoid lifting objects twenty-six pounds or greater; she could, however, lift zero to ten-pound objects without restriction and could frequently lift and carry eleven to twenty-five pound objects.  (Id.; see also id. at 1888 (physical capacities checklist).)[19]

Ms. Dolfi was examined again by Dr. Kline on March 14, 2000.  (See id. at 1868-1860.) Her complaints of pain were similar to those presented at the first IME, but she also reported significant depression and anxiety.  (Id. at 1867-1864.)  Dr. Kline performed a physical examination in which he again observed some inappropriate responses and symptom magnification, though milder relative to the first IME.  In this regard, the illness behavior profile

---

[19]On February 11, 2000, Dr. Kline approved a modified job description for Ms. Dolfi's position as job placement coordinator.  (AR at 1875.)

indicated only a moderate to high degree of inappropriate pain behavior.  (Id. at 1862.)  Dr. Kline affirmed his previous diagnosis and his opinion that Ms. Dolfi was capable of gainful employment consistent with the restrictions outlined after the first IME.  (Id. at 1862-1861.)  Moreover, Dr. Kline reviewed and approved a pre-injury job description conditioned only on Ms. Dolfi being permitted to "alter position for comfort measures."  (Id. at 1860; see also id. at 1854-1852.)

Ms. Dolfi submitted to an independent psychiatric examination performed March 17, 2000, by Gladys S. Fenichel, M.D.  (See id. at 1846-1839.)  Dr. Fenichel obtained a history from Ms. Dolfi in which she described her mental state after the work injury and recounted prior traumatic events.  (Id. at 1844-1842.)  Dr. Fenichel performed a mental status examination; reviewed medical records; reviewed Dwyer Adjustment Company's investigation file (including statements from Ms. Dolfi's co-workers); and reviewed Ms. Dolfi's personnel file (including a letter to Ms. Dolfi from LCCC's president advising her that funding shortfalls might necessitate "discontinuat[ion]" of her employment at LCCC).  (Id. at 1842-1840.)  Based on the above, Dr. Fenichel concluded Ms. Dolfi described symptoms of depression, but opined that the work incident was not the "type of stressor that would cause a depressive disorder or recurrence of depression."  (Id. at 1839.)  She disagreed with Mr. Youron's diagnosis of PTSD because the work incident did not qualify as a life-threatening injury.  (Id.)  Accordingly, Dr. Fenichel opined that, although she might be depressed, "from a psychiatric perspective there are no restrictions

25

or contraindications to Ms. Dolfi returning to work at [LCCC]." (Id.)[20]

E. Ms. Dolfi's Disability Claim

On or about June 17, 2004 – five years after Ms. Dolfi allegedly became disabled – U.S.

Life was notified by LCCC of Ms. Dolfi's impending claim for disability benefits. (Def.'s

Statement of Material Facts ("DSMF"), Dkt. Entry 21, ¶ 4.) It is undisputed that U.S. Life and

DRMS did not receive notice of Ms. Dolfi's claim before June 17, 2004. (DSMF ¶ 7.) A formal

Application for Long Term Disability Benefits was filed on or about September 23, 2004. (Id. ¶

---

[20]On February 4, 2003, Ms. Dolfi applied for Social Security Disability Insurance
benefits. (AR at 1469.) In connection with her application, she underwent a neurological
evaluation by Vincent Digiovanni, M.D., and a psychiatric consultative examination by Manikant
Desai, M.D. Dr. Digiovanni examined her on May 30, 2003. (See id. at 1461-1455.) He
diagnosed migraine headaches, cervical and lumbar myofascial injury, and questionable panic
attacks, observing that her main problem was psychiatric. (Id. at 1459.) From a neurological
perspective, however, her prognosis was fair. (Id. at 1460.) Dr. Digiovanni completed a
"Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities"
indicating Ms. Dolfi was capable of lifting and carrying occasionally up to twenty-pound objects;
standing and walking for one to two hours of an eight-hour work day; sitting for two to three
hours per work day; and bending, kneeling, stooping, and crouching occasionally (balancing or
climbing, however, never). (Id. at 1458-1457.)

Dr. Desai evaluated Ms. Dolfi on June 7, 2003. (See id. at 1464-1462.) Diagnosing
panic disorder, chronic PTSD, and depressive disorder, Dr. Desai concluded that Ms. Dolfi's
ability to sustain a routine, take precautions, and interact socially was limited. (Id. at 1463-
1462.)

On April 16, 2004, an administrative law judge granted Ms. Dolfi's application for social
security disability benefits retroactive to May 17, 1999. (Id. at 1466.) The judge found Ms. Dolfi
severely impaired physically and psychiatrically and, therefore, "disabled" under the Social
Security Act. (Id. at 1467.)

5.)  Further details of her claim were provided by Ms. Dolfi in a completed "Questionnaire and Activities of Daily Living."  (See AR at 394-390.)  She described her medical condition as "chronic back pain," "migraines," "post traumatic stress disorder," "panic attacks," "anxiety," and "leg pain," and alleged the condition was disabling because the pain, migraines, and anxiety attacks affected her continuously, and the medication prescribed therefor left her fatigued and dizzy.  (Id. at 394-393.)

As claims administrator, DRMS initiated review of Ms. Dolfi's disability claim. Acknowledging receipt of the claim in a letter dated October 1, 2004, DRMS advised Ms. Dolfi that her disability claim was untimely.  (AR at 176-175.)  Quoting directly from the Plan, DRMS explained that "'[p]roof of claim must be sent to [U.S. Life] within 30 days after the waiting period [180 days immediately following the onset of disability].'"  (Id. at 175 (quoting id. at 18).) Because she alleged a disability onset date of May 25, 1999, Ms. Dolfi's claim was received well after the waiting period.  (Id. at 175.)  Nevertheless, DRMS did not summarily deny her claim as untimely, but indicated it would consider her claim and "determine if the late notice of claim prejudices us."  (Id.)  Consequently, DRMS reserved the right to deny her claim because of the late notice.  (Id.)

On or about November 4, 2004, Ms. Dolfi responded to DRMS's concerns about the late notice, alleging LCCC misinformed her that she was precluded from simultaneously applying for disability benefits while receiving workers' compensation benefits.  (DSMF ¶ 6.)  Once the

workers' compensation claim was resolved, LCCC told Ms. Dolfi she could file for disability

benefits.  (AR at 396.)[21]  She further alleged that LCCC denied or ignored her repeated

requests, communicated shortly after she became disabled, for Plan information and an

application for benefits.  (Id.)

DRMS proceeded with its investigation of Ms. Dolfi's claim.  It sought and obtained

medical records from Ms. Dolfi's physicians, pharmacies, and the Wilkes-Barre General

Hospital.  (Id. at 423-438.)[22]  Additionally, Attending Physician Statements were completed and

returned by Drs. Farrell and Gelb.  (DSMF ¶ 10; AR at 1205-1204, 414-413.)[23]

---

[21]As part of the settlement, Ms. Dolfi resigned from LCCC.  (Pl.'s Statement of Material Facts ("PSMF"), Dkt. Entry 36, ¶ 8.)  The settlement agreement, in relevant part, provided that her "'resignation will in no way affect any vested benefits she continues to have . . . including her continued right to pursue her long term disability claim.'"  (AR at 1694.)

[22]Initially, DRMS sought records for the period beginning April 1, 1999, (see AR at 423-438), but then modified its requests to cover the period beginning June 1, 1998, to ascertain whether Ms. Dolfi's disability was casually related to a pre-existing condition.  (See id. at 995-1009, 1013, 1016.)

[23]In her "Attending Physician's Statement," Dr. Farrell diagnosed Ms. Dolfi's condition as "cervical myofascial strain, low back pain, lumbar radiculopathy, [and] anxiety."  (AR at 1205.)  The diagnosis, she argued, was supported subjectively – Ms. Dolfi's complaints of back pain, leg pain, and headaches – and objectively – MRIs obtained of the lumbar and cervical spines.  (Id.)  Despite lacking knowledge of Ms. Dolfi's main job duties and educational background, Dr. Farrell specified restrictions and limitations as no lifting objects equal to or greater than ten pounds and no bending, stooping, or lifting or working overhead.  (Id.)  Dr. Farrell categorized Ms. Dolfi's physical impairment as a "Class 5" impairment, defined as "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity* (75-100%)."  (Id. at 1204.)  Classification of Ms. Dolfi's mental/nervous impairment was deferred to a psychiatrist.  (Id.)  Dr. Farrell observed that Ms. Dolfi's chronic condition had remained unchanged since 1999, and,

(continued...)

In March, 2005, DRMS referred Ms. Dolfi's claim file, with all available medical

documents, for review and assessment to its medical consultant, Lisa Stiffler, R.N., B.S.N.

(DSMF ¶ 15.)  Nurse Stiffler was instructed to review the file and answer two questions:  (1)

whether DRMS can determine that Ms. Dolfi was disabled as of May 25, 1999, and if not, what

steps would have been taken to assess her alleged disability; and (2) whether DRMS can

determine that Ms. Dolfi was treated for her medical condition during the pre-existing condition

period, November 1, 1998, to February 1, 1999.  (AR at 1372.)

Nurse Stiffler submitted her answers on March 8, 2005.  As to the second question, no

records from the pre-existing period were available for review.  Therefore, Nurse Stiffler advised

that she could not determine whether Ms. Dolfi was treated for her medical condition during the

pre-existing condition period.  (Id. at 1370.)  As to the first question, Nurse Stiffler reviewed,

---

[23](...continued)
consequently, she did not anticipate significant improvement in the future.  (Id.)  Finally, Dr.
Farrell denied Ms. Dolfi was a suitable candidate for further rehabilitation services or that her
present job could be modified to accommodate her impairment.  (Id.)

Dr. Gelb also completed an "Attending Physician's Statement."  (See id. at 414-413.)
He diagnosed Ms. Dolfi's condition as "discogenic disease [with] radiculopathy," which he
stated was supported subjectively by Ms. Dolfi's complaints of pain and objectively by abnormal
MRI findings.  (Id. at 414.)  Aware of Ms. Dolfi's main job duties and her background, Dr. Gelb
specified restrictions and limitations to be no lifting, pushing, or pulling, and no prolonged sitting
or machine operation.  (Id.)  Dr. Gelb categorized her physical impairment as "Class 5," and her
mental/nervous impairment as "Class 2," defined as "[p]atient able to function in most stress
situations and engage in limited interpersonal relations (Slight Limitation)."  (Id. at 413.)  Dr.
Gelb's remaining conclusions were consistent with Dr. Farrell's.  (See id.)

among other things, office notes and reports, diagnostic studies and laboratory reports, deposition testimony, and an Attending Physician's Statement.[24]  Although observing that the events of April 26, 1999, were disputed, Nurse Stiffler thought Ms. Dolfi had sustained a work-related injury on April 26, 1999.  (Id. at 1369.)  She could not determine, however, Ms. Dolfi's functional capacity in 1999.

DRMS received additional records and submitted them to Nurse Stiffler for a supplemental review.  (DSMF ¶ 17.)[25]  On April 7, 2005, Nurse Stiffler submitted her supplemental findings.  Her answer to the second question was unchanged.  (AR at 1375.) Regarding whether Ms. Dolfi was disabled as of May 25, 1999, Nurse Stiffler acknowledged the workers' compensation and social security proceedings.  (Id. at 1374.)  Nevertheless, she was unable to determine "with any degree of medical certainty" that Ms. Dolfi's physical or psychological condition would have restricted or limited her ability to perform sedentary or light-duty work.  (Id.)  In this regard, Nurse Stiffler noted that MRI testing had been comprehensive

---

[24]Specifically, she reviewed X-rays, MRIs, and laboratory reports; records from Drs. Dhaduk (identified incorrectly as Dr. J.C. Barrera), Patel, Farrell, Berger, and Oh; a letter from Mr. Youron dated August 20, 1999; a letter from Dr. Farrell dated January 27, 2003; deposition testimony of Drs. Feinstein and Chandragiri; an Attending Physician Statement from Dr. Gelb; pharmacy records; and a social security disability award.  (AR at 1371-1370.)

[25]Those records included office notes from Drs. Gelb, Feinstein, Wolfson, Patel, Farrell; records from Wyoming Valley Health Care System (mostly emergency room visits); two notes from Dr. Feinstein dated, respectively, March 13, 2000, and June 26, 2000; a February 24, 2000, note from Dr. Chandragiri that Ms. Dolfi is to remain out of work for two weeks; additional MRIs and pharmacy records; and an Attending Physician Statement from Dr. Farrell.  (AR at 1377-1375.)

and shown cervical and lumbar disease, but no significant abnormalities, and that physical examinations had revealed tenderness along the cervical and lumbar paravertebral muscles, but no abnormal findings as to neurological, motor, sensory, or reflex functions.  (Id. at 1375-1374.)  Furthermore, Ms. Dolfi's symptomotology was mainly self-reported, and, despite years of treatment, there had been no significant change in her condition.  (Id. at 1374.)  Nurse Stiffler suggested that, in order to properly assess Ms. Dolfi's alleged disability, she might have conducted a home visit or referred Ms. Dolfi for a functional capacity evaluation ("FCE") and independent medical evaluation ("IME").  (Id.)  She dismissed these options as impractical given the substantial passage of time.  (Id.)

DRMS advised Ms. Dolfi in a letter dated May 3, 2005, of its decision to deny her claims for disability benefits.  (See id. at 1396-1393.)  The letter identified the medical records received and referred to DRMS's medical consultant for a comprehensive review and assessment.  (Id. at 1394.)  After summarizing the medical consultant's findings, DRMS explained that it was unable to conclude, "with any degree of medical certainty," that Ms. Dolfi's condition would have prevented her from working in 1999 as a job placement coordinator.  (Id.)  Additionally, DRMS claimed that the late notice prejudiced its ability to validate medical findings from six years ago.  (Id.)  Whether Ms. Dolfi's condition was pre-existing was also unclear from the records reviewed.  (Id.)

Ms. Dolfi appealed this determination, receipt of which was acknowledged by DRMS in a

letter dated September 27, 2005.  (DSMF ¶¶ 28 -29.)  Her entire file was referred to Alan

Neuren, M.D., for a comprehensive medical review and assessment.  (Id. ¶ 34.)  Dr. Neuren,

board certified in psychiatry and neurology, (id.), was asked to review the file "and if possible

comment on reasonable restrictions and limitations back to 1999 and thereafter."  (AR at 1433.)

Dr. Neuren submitted a report on October 25, 2005.  (See id. at 1433-1425.)  The report

set forth a brief synopsis of each medical record and diagnostic study reviewed by him.[26]  (Id. at

1433-1426.)  In the analysis section that followed, Dr. Neuren concluded that Ms. Dolfi was not

disabled by her physical injuries.  The MRIs and EMG, he observed, revealed nothing

significant.  "Had the insured sustained significant nerve root injury, abnormal findings would

have been demonstrable on EMG within three weeks."  (Id. at 1426.)  He observed that mild

carpal tunnel syndrome, shown on the EMG, would not have disabled Ms. Dolfi.  (Id.)

Furthermore, he noted that the lumbar MRI findings are "commonly seen in asymptomatic

individuals in this age group and are of no clinical significance."  (Id.)  Overall, Dr. Neuren noted

a "marked discrepancy" between Ms. Dolfi's subjective complaints and the objective findings.

(Id. at 1425.)  And while Ms. Dolfi had been diagnosed with strain/sprain injuries, Dr. Neuren

stated such injuries "are temporary transient, self-limiting injuries that should resolve within 4-8

---

[26]Dr. Neuren reviewed medical records from Drs. Patel, Berger, Farrell, Rittenberg,
Dhaduk, Wolfson, and Gelb, Nurses Blitz and Martin, and Mr. Youron; records from Wyoming
Valley Healthcare; depositions of Drs. Feinstein and Chandragiri; and various diagnostic
studies.  (AR at 1433.)

weeks [and that] would [not] interfere with a sedentary work capacity." (Id. at 1426.)

Accordingly, he concluded there was no indication that Ms. Dolfi was "incapable of functioning

in her usual capacity" because of her physical injuries. (Id. at 1425.) To the extent Ms. Dolfi

was claiming disability from a mental/nervous disorder, however, Dr. Neuren stated there was

insufficient information to make a determination and recommended obtaining records from any

mental health providers. (Id.)

On November 10, 2005, DRMS advised Ms. Dolfi that its initial review of her appeal did

not warrant reversing its prior decision. (Id. at 1438.) Rather than deny her appeal, DRMS

decided to consider the matter further and requested additional documentation from Guard.

(Id.) Meanwhile, on December 8, 2005, counsel for Ms. Dolfi submitted additional records for

DRMS's consideration. (DSMF ¶ 44.) The file was then referred to Dr. Neuren for another

comprehensive review.

Dr. Neuren submitted his second report on December 23, 2005. (See AR at 1789-

1782.) Like his first report, Dr. Neuren preceded his analysis with brief summaries of the

records he reviewed. (See id. at 1789-1783.)[27] The new information indicated Ms. Dolfi was

presenting "significant emotional difficulties around the time she stopped working"; several

providers observed her being "anxious, agitated, and depressed." (Id. at 1783.) Ms. Dolfi was

---

[27]His review included records from Drs. Feinstein, Patel, Chandragiri, Samii, Desai,
Berger, and Digiovanni; Dr. Farrell's office; Mr. Youron; and Wyoming Valley Healthcare
System. (AR at 1789, 1787-1786, 1784.)

treated regularly by Mr. Youron (and, at times, by Dr. Chandragiri), although counseling ceased after April, 2000, and did not resume until February 24, 2004.  (Id. at 1783-1782.)  Dr. Neuren concluded that Ms. Dolfi was "experiencing significant mental and nervous problems that would have interfered with her performing effectively in the workplace."  (Id. at 1782.)

The additional records, however, did not alter Dr. Neuren's opinion with respect to Ms. Dolfi's physical injures.  He reiterated the "marked discrepancy" between her subjective complaints and the objective findings.  (Id. at 1783.)  Her symptoms, as well the findings observed on examinations, Dr. Neuren stressed, varied from one appointment to another, which constituted "evidence of embellishment."  (Id. at 1783.)  Moreover, "[t]he presence of significant mental/nervous problems would strongly indicate the insured's physical symptoms are a manifestation of somatization."  (Id. at 1782.)  Accordingly, Dr. Neuren concluded Ms. Dolfi's physical injuries would not have impaired her ability to function in a sedentary capacity. (Id.)

DRMS received additional information from Ms. Dolfi's counsel and from Guard in late December, 2005, and early January, 2006.  (Id. at 1976; DSMF ¶ 50.)  This material was referred to Dr. Neuren, who undertook a third review of Ms. Dolfi's claim and submitted a report on January 18, 2006.  (See id. at 1966-1964)  The new information reinforced Dr. Neuren's previous conclusions.  He found no evidence that Ms. Dolfi "sustained any physical injury [or] has any physical impairment that would preclude her from functioning in a light to light-medium

capacity." (Id. at 1965.)  Her physical capacities, as set forth by Dr. Kline, were reasonable.

(Id.)  Indeed, Dr. Neuren adopted Dr. Kline's proposed restrictions.  (Id. at 1965-1964.)  The

new information also provided further evidence that Ms. Dolfi was suffering from significant

mental/nervous problems at the time she stopped working, although psychiatric treatment

stopped after April, 2000.  (Id. at 1965.)

　　　Adopting Dr. Neuren's conclusions, DRMS awarded Ms. Dolfi benefits for her mental,

nervous, or emotional disorder.  On January 19, 2006, DRMS sent notice of its decision to Ms.

Dolfi's counsel.  (See id. at 1978-1974.)  The letter explained that independent physician

consultant Dr. Neuren completed three reviews of Ms. Dolfi's claim file and summarized his

analysis with respect to the physical and psychiatric components of Ms. Dolfi's alleged

disability.  (Id. at 1976-1975.)  Based on Dr. Neuren's review, DRMS concluded Ms. Dolfi was

not physically disabled as defined under her Plan.  (Id. at 1976.)[28]  DRMS also determined,

however, that Ms. Dolfi was disabled by her "mental health disorder." (Id. at 1975.)  The letter

stressed, though, that Ms. Dolfi received appropriate psychiatric care only through April, 2000,

and did not resume such care until February 24, 2004.  (Id.)  Because an employee must be

under the "regular care of a physician" to be consider totally disabled, DRMS determined that

Ms. Dolfi was no longer disabled after April 30, 2000.  (Id.)  Consequently, she was awarded

---

　　　[28]DRMS also noted that the late notice prejudiced its ability to determine that Ms. Dolfi
was disabled physically.  (AR at 1975.)

benefits beginning November 21, 1999 (after accounting for the 180-day waiting period) and ending April 30, 2000.  (Id.)  DRMS issued Ms. Dolfi a benefit check for the closed period of disability (offset by social security and workers' compensation benefits).  (Id.; DSMF ¶ 78.)

Ms. Dolfi elected to pursue a voluntary additional appeal.  (DSMF ¶ 65.)  Enclosed with her appeal were additional medical records from Drs. Gelb, Berger, and Farrell.  (AR at 2013.) On March 24, 2006, DRMS acknowledged receipt of Ms. Dolfi's appeal.  (DSMF ¶ 66.)  One week later, DRMS requested additional information regarding Ms. Dolfi's treatment for depression, PTSD, and anxiety subsequent to April 30, 2000.  (Id. ¶ 66.)  Through counsel, she advised that Drs. Berger and Farrell and Northeast Counseling treated her for PTSD.  (AR at 2033.)  DRMS confirmed their addresses and telephone numbers, (see DSMF ¶¶ 68-69), then contacted these providers to ascertain whether they treated Ms. Dolfi anytime between April 30, 2000, and February 24, 2004.  (Id. ¶ 70.)

In a letter dated May 5, 2006, DRMS notified Ms. Dolfi's counsel that it completed an additional appeal review and determined its January 19, 2006, decision was appropriate.  (See AR at 2042-2040.)  The letter stressed that the definition of total disability requires an insured "'be under the regular care of a physician.'"  (Id. at 2042.(quoting id. at 10).)  Because Ms. Dolfi was not under the regular care of a physician for her psychiatric condition beyond April 30, 2000, she was not entitled to benefits after that date.  (Id.)  As to Ms. Dolfi's disability claim based on her physical condition, DRMS affirmed its previous decision, relying on the opinions

of Drs. Neuren and Kline.  (Id.)

Having exhausted her administrative remedies, Ms. Dolfi commenced this action under

Section 502(a)(1)(B) of ERISA "to recover benefits due to [her] under the terms of [her] plan."

29 U.S.C. § 1132(a)(1)(B).  (Dkt. Entry 1.)  She seeks disability benefits for the period after

April 30, 2000.  On April 30, 2007, U.S. Life filed a Motion for Summary Judgment, statement of

material facts, and supporting brief.  (Dkt. Entries 20, 21, 22.)  The administrative record was

lodged with the Court on May 3, 2007.  On May 14, 2007, Ms. Dolfi filed a Cross Motion for

Summary Judgment, statement of material facts, and supporting brief.  (Dkt. Entries 35, 36,

37.)  DRMS responded to Ms. Dolfi's motion on June 12, 2007.  (Dkt. Entries 40, 41.)  The

motions, therefore, are ripe for disposition.

II. DISCUSSION

A. Standard of Review

As a threshold matter the Court must determine the standard to be applied in reviewing

the denial of Ms. Dolfi's claim for disability benefits.  Relying primarily on an agreement in the

parties' Joint Case Management Plan ("JCMP"), U.S. Life urges the Court to apply the arbitrary

and capricious standard.  (Def.'s Br. Supp. Mot. Summ. J. ("Def.'s Br. Supp."), Dkt. Entry 22, at

9.)  Specifically, U.S. Life refers to the representation in the JCMP that the parties were in

agreement that "[t]he arbitrary and capricious standard of review is applicable to the review of

the administrator's determinations."  (JCMP, Dkt. Entry 14, at 4-5.)  Alternatively, U.S. Life

argues that the Plan language vests the administrator with discretionary authority to award

benefits, and thus the Court is constrained to apply the arbitrary and capricious standard.

(Def.'s Br. Resp. Pl.'s Mot. Summ. J. ("Def.'s Br. Resp."), Dkt. Entry 41, at 5-6.)

  For her part, Ms. Dolfi repudiates the agreement in the JCMP, alleging her assent was

based on incomplete information (the administrative record was unavailable) and therefore

ineffective.  (See PSMF ¶ 1.)  Furthermore, she contends the appropriate standard of review is

de novo because the Plan grants the administrator no discretionary authority.  (Pl.'s Br. Supp.

Cross-Mot. Summ. J. ("Pl.'s Br. Supp."), Dkt. Entry 37, at 7.)

  This Court has enforced agreements in joint case management plans entered into by

counsel for parties.  See, e.g., Fisher v. Marquip., Inc., No. 3:CV-99-1976, order at 3 (M.D. Pa.

Sept. 26, 2002) (Dkt. Entry 116) (order enforcing parties' agreement in joint case management

plan that there would be no limits on number of interrogatories and compelling defendant's

response to interrogatories).  But an agreement regarding discovery is different from an

agreement concerning a question of law, and courts are not bound by the latter.  See Mintze v.

Am. Gen. Fin. Servs., Inc. (In re Mintze), 434 F.3d 222, 228 (3d Cir. 2006).  The standard of

review applicable to a disability benefits decision is a question of law for which the parties'

agreement is not binding on the Court.  See Jones v. Metro. Life Ins. Co., 385 F.3d 654, 660

n.4 (6th Cir. 2004) ("Typically, parties may not determine by agreement [a court's] standard of

review.").  Consequently, this Court will make its own determination as to the standard of review

independent of the parties' agreement.  See Brauner v. Prudential Ins. Co. of Am., No. Civ. A. 04-531-JBC, 2006 WL 39058, at *1 n.1 (E.D. Ky. Jan. 4, 2006); VanVolkenberg v. Cont'l Cas. Co., 944 F. Supp. 198, 201 (W.D.N.Y. 1996); see also Coleman v. Pikeville United Methodist Hosp., Inc., Civ. A. No. 05-32-EBA, 2008 WL 819038, at *3, 4 (E.D. Ky. Mar. 25, 2008) (determining standard of review where plaintiff repudiates earlier stipulation).

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that a "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  When the language of a plan governed by ERISA accords the administrator discretionary authority to determine eligibility for benefits, judicial review is deferential and limited to ascertaining whether the denial is arbitrary and capricious.  See Vitale v. Latrobe Area Hosp., 420 F.3d 278, 281-82 (3d Cir. 2005); Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 44-45 (3d Cir. 1993).  Whether an administrator is vested with discretionary authority depends upon the terms of the plan.  Luby v. Teamsters Health, Welfare, & Pensions Trust Funds, 944 F.2d 1176, 1180 (3d Cir. 1991).  Some benefit plans expressly accord the administrator discretionary authority.  See, e.g., Russell v. Alcoa, Inc., No. 3:CV-06-1459, 2008 WL 906448, at *1 (M.D. Pa. Mar. 31, 2008).  But discretion need not be expressly granted in order to subject an administrator's decision to arbitrary and capricious review; discretion may be implied from the plan's terms.  Hullett v.

39

Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 114 (3d Cir. 1994); see also Luby, 944

F.2d at 1180 ("no 'magic words,' such as 'discretion is granted . . .,' need be expressly stated

. . . so long as the plan on its face clearly grants such discretion" (quoting de Nobel v. Vitro

Corp., 885 F.2d 1180, 1187 (4th Cir. 1989))).

      In this case, the Plan lacks an explicit grant of discretionary authority to award disability

benefits.  U.S. Life, however, contends that the Plan contains language implying discretion,

pointing to two provisions set forth under the claims-filing procedure.  First, the Plan provides

that U.S. Life "'may require more proof as often as needed to verify disability.'"  (Def.'s Br.

Resp. 6 (quoting AR at 18).)  Second, the Plan provides that U.S. Life, "'at its expense, has the

right to examine the insured.  This may be done as often as needed to process a claim.'"  (Id.

(quoting AR at 18).)

      The Court finds that these provisions grant U.S. Life discretionary authority to award

disability benefits.  Under the Plan, U.S. Life is more than a passive actor assuming a

ministerial role in the claim administration process.  Rather, U.S. Life may require as much

proof as necessary to "verify" a claimant's disability before awarding benefits.  To "verify" is

commonly understood as "[t]o determine or test the truth or accuracy of, as by comparison,

investigation, or reference."  American Heritage Dictionary of the English Language (4th ed.

2004), available at http://dictionary.reference.com/browse/verify.  By granting U.S. Life the right

to verify disability, the Plan confers the power to investigate a claim, consider the evidence

before it, and make a determination whether the claimant is in fact disabled under the Plan.  If

U.S. Life is able to verify a claim, benefits are awarded; if unable, benefits are denied.  In other

words, some deliberation occurs in order to verify a disability.  See Mitchell v. Prudential Health

Care Plan, No. Civ. A. 01-331 GMS, 2002 WL 1284947, at *7 (D. Del. June 10, 2002) ("The

ability to think or deliberate prior to making a decision is the touchstone of discretion.").

Moreover, U.S. Life has the right under the Plan to require additional proof of disability and

examine the claimant, as often as necessary, to verify a claimant's disability and process her

claim.  This language signifies that U.S. Life will carefully assess the evidence before it and

award benefits only if it can verify an insured's alleged disability.  See Russell v. Paul Revere

Life Ins. Co., 148 F. Supp. 2d 392, 400-01 (D. Del. 2001), aff'd, 288 F.3d 78 (3d Cir. 2002)

(finding discretion from Plan language that "satisfactory" proof of disability must be presented).

        Viewed together, these provisions are sufficient to accord U.S. Life discretionary

authority when making disability determinations, and its decision is subject to review under the

arbitrary and capricious standard.  That standard applies even though the benefits decision

here was actually rendered by DRMS.  By employing DRMS to administer the Plan, U.S. Life

delegated its decision-making authority under the Plan to DRMS.  Because U.S. Life reserved

to itself discretionary authority, its delegation to DRMS of decision-making authority

encompassed its discretionary authority as well.  See Geddes v. United Staffing Alliance

Employee Med. Plan, 469 F.3d 919, 926 (10th Cir. 2006); Hitchens v. Wash. Group Int'l, Inc.,

480 F. Supp. 2d 746, 752 (D. Del. 2007).  Consequently, the Court will apply the arbitrary and

capricious standard in reviewing DRMS's decision.

Even if arbitrary and capricious review is appropriate, Ms. Dolfi argues that a conflict of

interest warrants greater scrutiny of DRMS's decision.  (Pl.'s Br. Supp. 7-8.)  "[I]f a benefit plan

gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that

conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"

Firestone, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)).  A

typical conflict – "structural" – "arises when the administrator has a non-trivial financial incentive

to act against the interests of the beneficiaries" and routinely deny claims in borderline cases.

Post v. Hartford Ins. Co., 501 F.3d 154, 162-63 (3d Cir. 2007).  For example, a structural

conflict will be found where an employee benefit plan is both funded and administered by an

outside insurer.  Metro. Life Ins. Co. v. Glenn, No. 06-923, 2008 WL 2444796, at *5, 7 (U.S.

June 19, 2008); Post, 501 F.3d at 163.  If such a conflict exists, the Court "continues to apply a

deferential standard of review to the discretionary decisionmaking of a conflicted

[administrator]," but must consider the conflict as just one of many factors "when determining

whether the [administrator], substantively or procedurally, has abused [its] discretion."  Glenn,

2008 WL 2444796, at *7.[29]  The plaintiff bears the burden of demonstrating the existence of a

_____

[29]Before Glenn, courts in this circuit scrutinized a conflicted-administrator's decision
under a heightened arbitrary and capricious standard.  In Pinto v. Reliance Standard Life
(continued...)

42

conflict of interest.  Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 617 (E.D. Pa.

2003) (citing Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees,

970 F.2d 1165, 1173 (3d Cir. 1992)).

Beyond a conclusory assertion, Ms. Dolfi has failed to demonstrate the existence of a

structural conflict of interest that must be considered by this Court in reviewing the benefits

decision.  Unlike Glenn and other cases involving insurers, U.S. Life did not in fact both fund

and administer the Plan.  On the contrary, U.S. Life contracted with a third-party claims

administrator, DRMS, to administer claims for disability benefits, including Ms. Dolfi's.  DRMS

handled all aspects of the claim administration process, from initial review to final appeal to

issuing a benefits check, and there is no evidence that its decision here was subject to final

approval by U.S. Life.  This kind of arrangement does not ordinarily give rise to a conflict of

interest.  See Porter v. Broadspire, 492 F. Supp. 2d 480, 485-86 (W.D. Pa. 2007); accord

Louderback v. Litton Indus., Inc., 504 F. Supp. 2d 1145, 1149-50 (D. Kan. 2007).[30]

---

[29](...continued)
Insurance Co., 214 F.3d 377, 392 (3d Cir. 2000), our Court of Appeals adopted a sliding scale
approach to decide to what degree a heightened arbitrary and capricious standard applies
when a conflict of interest is present.  Under this approach, a court must adjust the level of
deference to reflect the degree of conflict.  Id. at 393.  Whether this approach survives Glenn
need not be resolved by this Court, since, as explained below, Ms. Dolfi has not shown a
conflict of interest.

[30]Our Court of Appeals has held that a heightened standard of review is also appropriate
where the record "demonstrate[s] procedural irregularity, bias, or unfairness in the review of the
claimant's application for benefits" that undermines the administrator's neutrality.  Kosiba v.
(continued...)

In summary, the Court will review the benefits decision under an arbitrary and capricious standard.  Under this standard, the Court "'is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits,'" Schlegel, 269 F. Supp. 2d at 617 (quoting Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997)), but must defer to the administrator unless its decision is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  Id. (quoting Abnathya, 2 F.3d at 45).  The Court's review is limited to the evidence that was before the administrator when it rendered its decision.  See Mitchell, 113 F.3d at 440.  A plaintiff asserting a claim for benefits under 29 U.S.C. § 1132(a)(1)(B) has the burden of proving the administrator's decision was arbitrary and capricious.  DeCurtis v. Metro. Life Ins. Co., Civ. A. No. 3:CV-05-0118, 2006 WL 1330112, at *9 (M.D. Pa. May 16, 2006) (citing Foley v. Int'l Bhd. of Elec. Workers Local 98 Pension Fund, 271 F.3d 551, 559 n.9 (3d Cir. 2001)).

      B. Merits of Ms. Dolfi's ERISA Claim

In arriving at its initial decision to deny Ms. Dolfi's claim, DRMS relied on the conclusions

---

[30](...continued)

Merck & Co., 384 F.3d 58, 66 (3d Cir. 2004).  Examples of procedural irregularities, or suspicious events, include "(1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability."  Post, 501 F.3d at 164-65 (citations omitted).  As with a structural conflict of interest, Ms. Dolfi has failed to show any procedural irregularities during the administration of her claim that would warrant greater scrutiny.

of its medical consultant, Nurse Stiffler.  Based on her comprehensive review of available

medical records, Nurse Stiffler was unable to conclude that Ms. Dolfi's physical and mental

conditions precluded her from working as a job placement coordinator.  The passage of time

and inability to conduct an IME or FCE, Nurse Stiffler also noted, made it difficult to assess Ms.

Dolfi's condition.  After summarizing Nurse Stiffler's findings, DRMS concluded:

> [w]hile we acknowledge your continued complaints of pain, we are unable to
> comment, with any degree of medical certainty, that your pain complaints or
> other medical conditions would preclude your ability to work in a sedentary or
> light duty work capacity from 1999 to present.  As we are unable to quantify
> or validate the medical findings of 6 years ago, we find that our ability to make
> a liability decision on your claims has been prejudiced. . . .

(AR at 1394.)  This conclusion, premised on Nurse Stiffler's reports, is supported by the

administrative record.

At the first appeal, Ms. Dolfi submitted additional medical records, and DRMS sought

and obtained records from Guard.  Her claim file was reviewed three times by DRMS's

independent physician consultant, Dr. Neuren.  His reports reflect an extensive review of the

medical records.  Dr. Neuren divided Ms. Dolfi's claim into two components: physical and

psychological.  As to the former, Dr. Neuren questioned the severity of Ms. Dolfi's injuries.  Dr.

Neuren noted that strain/sprain injuries, diagnosed by some of Ms. Dolfi's doctors, ordinarily

resolve in a few weeks and would not interfere with a sedentary work capacity.  Moreover, he

noted a "marked discrepancy" between Ms. Dolfi's subjective complaints of pain and the

objective findings.[31]  In this regard, Ms. Dolfi often complained of pain radiating into her arms

and into her right leg, suggesting "significant nerve root injury."  Several diagnostic tests,

however, revealed no nerve root compromise or other significant abnormalities to substantiate

her complaints.[32]  The lack of objective corroboration, along with the fact that Ms. Dolfi's

complaints and her doctors' physical examination findings varied between appointments, Dr.

Neuren observed, suggested symptom embellishment.  Significantly, Dr. Neuren expressed this

observation <u>before</u> he reviewed the IME reports of Dr. Kline.  Finally, Dr. Neuren found

appropriate the work restrictions suggested by Dr. Kline.  This conclusion was reasonable,

---

[31]Radiculopathy can be diagnosed through objective evidence such as MRIs, EMGs, and nerve conduction studies.  <u>See generally</u> <u>Wilson v. Metro. Life Ins. Co.</u>, Civ. A. No. 04-CV-05477, 2006 WL 3702635, at *6, 9-10 (E.D. Pa. Dec. 13, 2006).  As such, a denial of benefits based, in part, on the lack of objective evidence is not arbitrary and capricious.  <u>See</u> <u>Likas v. Life Ins. Co. of N. Am., Inc.</u>, No. 3:03-0314, 2006 WL 47309, at *13-14 (M.D. Tenn. Jan. 6, 2006); <u>cf.</u> <u>Mitchell</u>, 113 F.3d at 442-43 (decision to deny benefits for lack of objective evidence arbitrary and capricious because medical condition at issue incapable of being substantiated objectively and is usually "diagnosed partially through a process of elimination" (quotation omitted)).

[32]To be sure, an October 24, 2002, MRI of the lumbar spine showed L3-4 disc degeneration and protrusion "compressing the nerve roots on both sides" with left-sided nerve root compression at L3-4, (AR at 1501), and a July 19, 2004, MRI of the lumbar spine showed moderate disc degeneration at L3-4, with disc space narrowing, and "broad based osteodiscophytic protrusion resulting in mild formaninal narrowing . . . more pronounced on the left." (Id. at 1342.)  But while these results may establish Ms. Dolfi's condition as of 2002 or 2004, they are inconsistent with earlier studies and are of little probative value in determining Ms. Dolfi's condition and physical capacity as of May 25, 1999.  <u>See</u> <u>Hall v. Life Ins. Co. of N. Am.</u>, 151 F. Supp. 2d 831, 835 (E.D. Mich. 2001) (where plaintiff claims he was disabled on or before December 3, 1996, administrator's decision to deny benefits not arbitrary and capricious where plaintiff submitted no evidence other than psychological evaluations from October, 1998, through April, 2000).

given the medical evidence and the conflicting opinions as to Ms. Dolfi's physical capabilities. Based on his review, Dr. Neuren concluded that Ms. Dolfi's physical injuries would not have precluded her from working.  This conclusion has ample evidentiary support.

Regarding the psychological component, Dr. Neuren stated after his first review that there was insufficient evidence to determine whether Ms. Dolfi was disabled from a mental/nervous disorder.  He recommended obtaining records from any mental health provider. Heeding this recommendation, DRMS sought additional records from Guard.  These records, along with those submitted by Ms. Dolfi, were referred to Dr. Neuren.  Based on the new information, he concluded that Ms Dolfi "was experiencing significant mental and nervous problems that would have interfered with her performing effectively in the workplace."  (Id. at 1782; see also id. at 1965.)  He also noted that mental health treatment ceased after April, 2000, and did not resume again until February 24, 2004.  DRMS accepted Dr. Neuren's conclusion and awarded Ms. Dolfi disability benefits for her mental illness.  Benefits were awarded only through April 30, 2000, however, because Ms. Dolfi was not thereafter under the regular care of physician for her mental illness as required by the Plan.  In this regard, DRMS interpreted "under the regular care of a physician" to mean, for a mental disorder, to be treated by a psychologist, psychiatrist, or other mental health professional.  This determination, premised on a reasonable interpretation of the Plan, is supported by the record.  Accordingly, DRMS's disposition of the first appeal was not arbitrary and capricious.

Finally, during the second appeal, DRMS actively investigated whether Ms. Dolfi received treatment for her mental illness after April 30, 2000.  In this regard, DRMS corresponded with and sought information from Ms. Dolfi's attorney and contacted Drs. Chandragiri and Berger to ascertain dates of treatment.  No evidence was uncovered that established Ms. Dolfi was under the regular care of a physician for her mental illness after April 30, 2000.[33]  DRMS also affirmed its decision denying disability benefits based on Ms. Dolfi's physical injuries.  The record supports DRMS's disposition of the second appeal, and therefore its decision was not arbitrary and capricious.[34]

Ms. Dolfi argues that DRMS's decision reflects an arbitrary and capricious disregard of evidence.  "The voluminous record . . . sets out a clear and exhaustive demonstration of claimant's disability, and its medical support."  (Pl.'s Br. Supp. 8.)  From this voluminous record, however, she identifies only three records to bolster her assertion that DRMS acted arbitrarily and capriciously.  First, there is the December 9, 1999, report of Dr. Wolfson, in which he

---

[33]Ms. Dolfi implicitly concedes this point in her brief:

In addition to the physical conditions, Plaintiff suffers from mental disorders which make her unable to work.  She treated with Dr. Sanjay Chandragiri through April 2000.  Thereafter, she undertook care with Matthew Berger, M.D. . . .

(Pl.'s Br. Supp. 8.)  It is undisputed that Ms. Dolfi did not treat with Dr. Berger until February 24, 2004.

[34]In light of this determination, there is no need to address the question of whether U.S. Life was prejudiced by the delay in Ms. Dolfi submitting her claim.

48

diagnosed Ms. Dolfi's condition as "'Right Lumbar Radiculopathy, Herniated Lumbar Disc L3/4,'" and "'Cervical Radiculopathy.'"  (Id. (quoting AR at 1516).)  Second, Ms. Dolfi points to Dr. Dhaduk's July 16, 1999, report; he diagnosed her work-related injury as "'severe post-traumatic tension vascular headache,'" "'cervical radiculopathy with paraspinal muscle spasm,'" and "'degenerative and herniated disc with lumbar radiculopathy mainly at L5-SI level.'"  (Id. (quoting AR at 1513).)  Third, she refers to an October 6, 2003, letter from Dr. Farrell to Ms. Dolfi's workers' compensation attorney advising counsel that Ms. Dolfi has been a patient since September 7, 1999, and that she suffers from "'severe debilitating chronic and radiating pain'" in her back following a work-related injury sustained April 26, 1999.  (Id. (quoting AR at 1590).)

Considered singularly or conjunctively, these documents do not establish that DRMS's decision was arbitrary and capricious.  With respect to Drs. Wolfson and Dhaduk, both examined Ms. Dolfi and diagnosed her condition, yet neither stated whether and to what extent her condition was disabling.  Moreover, although both diagnosed cervical and lumbar radiculopathy, these diagnoses were substantiated only by Ms. Dolfi's subjective complaints.  Drs. Wolfson and Dhaduk reviewed MRIs of Ms. Dolfi's cervical and lumbar spines and Dr. Dhaduk also reviewed an EMG – none of which showed nerve root damage suggestive of radiculopathy and, in the case of the EMG and September 21, 1999 MRI, explicitly stated there was no evidence of radiculopathy – but nevertheless opined that Ms. Dolfi suffered from

cervical and lumbar radiculopathy.[35]  As to Dr. Farrell's October 6, 2003, letter, it was written

over four years after the alleged onset of Ms. Dolfi's disability and thus has minimal probative

value.  More importantly, Dr. Farrell's opinion is not supported by objective medical evidence,

as this Court's laborious review of the medical record demonstrates.  Accordingly, DRMS's

failure to give controlling weight to these three documents and find Ms. Dolfi disabled was not

arbitrary and capricious.

　　　　Ms. Dolfi also contends that DRMS's decision was arbitrary and capricious because it

relied on Dr. Neuren's conclusions while rejecting the opinions of her treating physicians.  (Pl.'s

Br. Supp. 9.)  She also faults Dr. Neuren's conclusions because they were based solely on a

review of her claim file, rather than a physical examination.  (Id.)[36]  U.S. Life counters that

DRMS was not required to accord special weight to the opinions of Ms. Dolfi's treating

physicians.  (Def.'s Br. Resp. 9.)  And to the extent Ms. Dolfi attacks Dr. Neuren's conclusions

---

[35]Notably, when Dr. Wolfson saw Ms. Dolfi for a follow-up visit on February 8, 2000, and
reviewed her recent cervical MRI – which was normal – he offered a more generalized
impression of her condition: "Intractable Neck Pain, Headache, and Low Back Pain." (AR at
795.)

[36]Additionally, Ms. Dolfi criticizes Dr. Neuren for apparently reviewing only the diagnostic
imaging reports, not the actual films, and contends he was unqualified to assess her condition
because he "is not board certified in either neurological surgery nor orthopedic surgery." (Pl.'s
Br. Supp. 9.)  Assuming Dr. Neuren reviewed only the diagnostic reports, as opposed to the
actual films, there is nothing to suggest that the reports are inaccurate.  As to Dr. Neuren's
qualifications, Ms. Dolfi does not dispute that he is board certified in neurology and psychiatry.
As such, Dr. Neuren is sufficiently qualified such that his selection by DRMS to review Ms.
Dolfi's claim was not arbitrary and capricious.

because they are based on a records review, U.S. Life asserts that it was Ms. Dolfi's late notice that limited DRMS to a records review.  (Id. at 8-9.)

In Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003), the Supreme Court rejected the "treating physician rule" advocated here by Ms. Dolfi:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's
> reliable evidence, including the opinions of a treating physician.  But, we hold,
> courts have no warrant to require administrators automatically to accord
> special weight to the opinions of a claimant's physician; nor may courts
> impose on plan administrators a discrete burden of explanation when they
> credit reliable evidence that conflicts with a treating physician's evaluation.

Indeed, special deference makes no sense because the possibility of a conflict of interest is just as real with respect to a treating physician who, "'in a close case, may favor a finding' for the patient."  Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 255 (3d Cir. 2004) (quoting Nord, 538 U.S. at 832).  An administrator's reliance on the opinions of its non-treating medical consultants over the opinions of a claimant's treating physicians, therefore, does not render its denial of disability benefits arbitrary and capricious.  See Brandeburg v. Corning Inc. Pension Plan for Hourly Employees, No. Civ. A. 04-1314, 2006 WL 2136481, at *2 (W.D. Pa. July 28, 2006); Schlegel, 269 F. Supp. 2d at 627-28.  Moreover, an administrator's reliance on the opinion of a qualified medical expert demonstrates that its decision was reasonable.  See Fillar v. UNUM Provident Corp., No. 4:05-CV-111, 2006 WL 2331184, at *7 (W.D. Mich. Aug. 10, 2006).

Here, Dr. Neuren reviewed all of the medical records submitted in support of Ms. Dolfi's

claim, including those of her treating physicians, and concluded that her physical injuries would not impair her ability to perform her duties as job placement coordinator.  His reports show that he considered and addressed the subjective complaints and physical examination findings observed by Ms. Dolfi's treating physicians, along with their diagnoses and impressions.  His contrary conclusions merely reflect a professional disagreement with Ms. Dolfi's treating physicians.  Accordingly, DRMS's decision to credit Dr. Neuren's conclusions over those of Ms. Dolfi's treating physicians was not arbitrary and capricious.  See Stratton, 363 F.3d at 258.

Moreover, that Dr. Neuren's conclusions are based on a paper review, rather than a physical examination, does not demonstrate that DRMS acted arbitrarily and capriciously.  Whether a physician has physically examined a claimant is simply a factor that informs the Court's review under the arbitrary and capricious standard.  See Fillar, 2006 WL 2331184, at *7.  And while the Plan in this case grants DRMS the right to physically examine Ms. Dolfi as often as needed, it is under no obligation to exercise that right, see Moskalski v. Bayer Corp., No. 2:06-cv-568, 2008 WL 2096892, at *10 (W.D. Pa. May 16, 2008), and its election to rely on a paper records review is not per se arbitrary and capricious.  See Fillar, 2006 WL 2331184, at *7; Brandeburg, 2006 WL 2136481, at *2.  Here, because of the passage of time between the filing of Ms. Dolfi's claim and the onset of her alleged disability, the decision to forego a physical examination was reasonable.  See Hall, 151 F. Supp. 2d at 835 n.2.  Furthermore, Dr. Neuren's reports reflect an extensive review of Ms. Dolfi's medical records.  Ms. Dolfi does not contend

that Dr. Neuren's review was inadequate.  Therefore, DRMS's reliance on Dr. Neuren's

conclusions was not arbitrary and capricious.

In summary, DRMS, through its medical consultants, carefully reviewed the medical

evidence, deliberated, and reached a rational decision regarding Ms. Dolfi's disability.

Considering the entire administrative record under the arbitrary and capricious standard of

review, the Court is unable to find that the benefits decision was arbitrary and capricious.

III. <u>CONCLUSION</u>

For the reasons stated, U.S. Life's Motion for Summary Judgment will be granted, and

Ms. Dolfi's Cross Motion for Summary Judgment will be denied.  An appropriate Order follows.


s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRENDA DOLFI                                         :
                          Plaintiff                  :
                                                     :
        v.                                           :        3:CV-06-1262
                                                     :        (JUDGE VANASKIE)
DISABILITY REINSURANCE                               :
MANAGEMENT SERVICES, INC., UNITED                    :
STATES LIFE INSURANCE COMPANY                        :
                          Defendants                 :

ORDER

NOW, THIS 21st DAY OF AUGUST, 2008, for the reasons set forth in the foregoing

Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant United States Life Insurance Company's Motion for Summary Judgment

(Dkt. Entry 20) is GRANTED, and Plaintiff Brenda Dolfi's Cross Motion for Summary Judgment

(Dkt. Entry 35) is DENIED.

2. Judgment shall be entered in favor of Defendant United States Life Insurance

Company and against Plaintiff Brenda Dolfi.

3. The Clerk of Court shall mark this action CLOSED.

                                        s/ Thomas I. Vanaskie
                                        Thomas I. Vanaskie
                                        United States District Judge